**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) BILLY JOE HALL,<br>(2) ISAAC SANCHEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>(1) CUSTER COUNTY SHERIFF, in his Official Capacity,<br><br>Defendant. | CASE NO.: CIV-25-204-JD<br><br>Attorney Lien Claimed<br>Jury Trial Demanded |

## COMPLAINT

**COME NOW**, the Plaintiffs Billy Joe Hall and Isaac Sanchez, and for their Complaint against the above-named Defendant, state and allege as follows:

## PARTIES

1. Plaintiff Billy Joe Hall ("Mr. Hall") is an individual and a citizen of the State of Oklahoma.

2. Plaintiff Isaac Sanchez ("Mr. Sanchez") is an individual and a citizen of the State of Oklahoma.

3. Defendant Sheriff of Custer County, Oklahoma ("Sheriff") is the Sheriff of Custer County, Oklahoma, residing in Custer County, Oklahoma and acting under color of state law. The Sheriff is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v.*

*Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing the Sheriff in his official capacity, Plaintiffs have brought suit against Custer County/CCSO. The Sheriff / CCSO is ultimately responsible for the health and safety of inmates and detainees housed at the Custer County Jail.

## JURISDICTION AND VENUE

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

5. This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

6. The acts complained of herein occurred in Custer County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

- **Facts Specific to Plaintiffs**

7. Paragraphs 1-6 are incorporated herein.

8. On or around February 18, 2023, Plaintiff Isaac Sanchez was transferred from the Beckham County Jail to the Custer County Jail ("Jail").

9. Plaintiff Billy Joe Hall was also an inmate at the Custer County Jail in February 2023.

10. Mr. Sanchez and Mr. Hall are brothers.

11. When Mr. Sanchez arrived at the Jail, he asked to be placed in the same pod as his brother, Mr. Hall.

12. During Mr. Sanchez's intake at the Jail, multiple Jail guards said that Mr. Sanchez was "probably going to get his ass beat" at the Jail.

13. Shortly after Mr. Sanchez's arrival at the Jail, it became clear to him that another inmate, Teddy Tasso, whom Mr. Sanchez did not previously know, was effectively "running" the Jail. Guards let Inmate Tasso and his crew do whatever they wanted and guards did not challenge Tasso even when he openly violated Jail policies.

14. Upon information and belief, the guards were referencing Inmate Tasso (and the inmates at the Jail who were allies of Tasso) when they told Mr. Sanchez that he was "probably going to get his ass beat" at the Jail.

15. Upon information and belief, Jail staff knew, or it was obvious, that Inmate Tasso and his crew routinely used violence to generate fear and assert their dominance over the Jail inmates who were not affiliated with them, like Mr. Hall and Mr. Sanchez.

16. On Mr. Sanchez's first day at the Jail, Inmate Tasso approached Mr. Sanchez and said, "don't think you're tough just because your brother is here." At the time, Mr. Sanchez had not done anything to provoke Inamte Tasso, nor had he had any previous interactions with Tasso.

17. During Mr. Hall's time at the Jail in February 2023, prior to Mr. Sanchez's arrival, he noticed Inmate Tasso making a hand-made "shank" on at least two occasions.

18. Inmate Tasso was not particularly inconspicuous when making the shank, yet no guards ever stopped him from making it.

19. Upon information and belief, Inmate Tasso was well-known by guards to physically assault other inmates, especially inmates who were "new" at the Jail, like Mr. Sanchez.

20. On or around February 20, 2023, Mr. Sanchez received notice that he had been bonded out of the Jail. Sanchez walked down the stairs from the upper level of the pod to the lower level to call his daughter to pick him up.

21. At this time, no Jail staff was present in the pod.

22. Tasso walked by and made a threatening statement to Sanchez as Sanchez was on the phone with his daughter. Sanchez told Tasso he was on the phone and turned away.

23. Tasso then returned upstairs and attacked Mr. Hall, completely unprovoked.

24. Tasso used his shank to cut Mr. Hall and also repeatedly punched him in the face while one of his allies attacked another inmate.

25. Mr. Sanchez heard the fight break out and hurried up the stairs, where he was also attacked by Tasso and his crew.

26. Tasso and his crew seriously injured both Hall and Sanchez, punching them repeatedly in the face and cutting them with shanks.

27. During the attack, Tasso and/or one of his allies pushed Hall down the stairs, grievously injuring him.

28. Another inmate recorded the majority of the fight on a contraband cell phone.

29. Mr. Sanchez grabbed the severely injured Mr. Hall and dragged him to the door the jailers would use to enter the pod.

30. Upon information and belief, Mr. Hall and Mr. Sanchez yelled for help, but it took several minutes for any Jail staff to come to the pod.

31. Despite it being obvious a fight was happening and the fact that the pod was video-monitored, Jail staff failed to intervene while Sanchez and Hall were brutally beaten by Tasso and his crew.

32. When a jailer finally came to the door, he didn't enter, but rather opened part of the door, stuck his "OC" spray through, and ordered the inmates to back up.

33. During this time, Tasso and his crew continued to pummel the defenseless and injured Hall and Sanchez.

34. Minutes later, a jailer finally opened the door and removed Sanchez and Hall from the pod.

35. Mr. Sanchez, while seriously injured, was stable enough to leave with his daughter. Once out of the Jail, Mr. Sanchez went to the hospital to receive treatment for his injuries.

36. Mr. Hall, on the other hand, was life-flighted to a hospital in Oklahoma City, where he received treatment for his injuries.

37. Photographs of Hall and Sanchez taken at the hospital immediately after the beating show that their faces were both beaten to a bloody pulp.

38. The Eighth Amendment and Fourteenth Amendment alike require that inmates and detainees be given reasonably adequate conditions of confinement. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the United States Constitution.

39. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

40. Jail staff had actual knowledge, or it was obvious, that Plaintiffs were at substantial risk of inmate-on-inmate assault.

41. With deliberate indifference, Jail staff failed to protect Plaintiffs from harm, and disregarded the known, obvious and excessive risks of harm to Plaintiffs.

42. As a direct proximate result of Jail staff's unlawful conduct, Plaintiffs have suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and damage.

- **County Policies and Customs**

43. Paragraphs 1-42 are incorporated herein.

44. There is an affirmative link between the aforementioned unconstitutional acts of Jail staff and policies, practices and/or customs which Custer County/CCSO promulgated, created, implemented and/or possessed responsibility for.

45. Upon information and belief, in recent years, a chronic shortage of detention officers – and inadequate training and supervision of the detention officers the Jail *has* employed – made it impossible to adequately supervise the Jail.

46. Upon information and belief, due to the lack of adequate staffing, training, and supervision, and an attitude of indifference toward inmate safety, inmate-on-inmate assaults became commonplace at the Jail.

47. Reports from the Oklahoma Department of Health's Jail Inspection Division ("JID") reveal that the Jail/Sheriff/County were informed on numerous occasions in the years prior to 2023 that Jail staff were routinely failing to conduct the required one-hour sight checks on inmates at the Jail.

48. Indeed, in both 2021 and 2022 the Jail was cited due to jailers' failures to conduct required hourly sight checks of both inmates and inmates' cells.

49. For long periods of time, inmates were left alone in large pods with no supervision at all.

50. Additionally, jailers routinely failed to adequately search inmates and their cells, allowing inmates to possess all kinds of contraband, from homemade weapons to cell phones.

51. Inadequate staffing, training, and supervision led to conditions at the Jail where violent inmates, like Tasso, had the freedom to make and conceal weapons, like shanks, and maintain them in their cells. Inmates like Tasso also had the freedom to use violence and the threat of violence to control the Jail without fear of reprimand from Jail staff.

52. Further, a JID inspection from July 2023 revealed that inmates were allowed access to numerous items that could be used as weapons or made into weapons, such as razors, razor blades, pens, nail clippers, and toothbrushes.

53. Photographs from the July 2023 inspection show numerous pens, razors, and razorblades scattered around the inmates' quarters.

54. The July 2023 inspection also revealed that jailers were *still* failing to conduct hourly sight checks on inmates and inmates' cells, despite the previous citations and recent attack on Mr. Hall and Mr. Sanchez.

55. Despite promising the JID that he would remedy the deficiencies related to the monitoring of inmates found in 2021, 2022, and 2023, the Sheriff had still taken no steps to improve inmate safety and supervision by 2024.

56. In May 2024, the JID found that the Jail had *still* not fixed its chronic failure to safely house and adequately monitor inmates.

57. JID Inspectors determined that jailers were still not routinely conducting sight checks, searching inmates' cells, monitoring items that could be used as weapons, like razors/razor blades, or preventing inmates from possessing contraband.

58. The inspectors again found multiple razors/razor blades sitting out in the open.

59. The Sheriff's deliberate indifference to the JID's reports and other clear evidence warning that inadequate staffing, training, and supervision continues to lead to detainee-on-detainee violence violates all detainees' rights to be free from harm and threat, in violation of the United States Constitution.

60. The Sheriff/Custer County plainly failed to adequately train and supervise its officers, in violation of policies and the Oklahoma Jail Standards, with respect to, *inter alia*: protection of inmates, inmate-on-inmate assault, adequate medical care for injured inmates,

cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

61. In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the Sheriff's/County's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable. Violent inmates, like Tasso, have been allowed to be the *de facto* Administrators at the Jail.

62. The County/Sheriff have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies that have plagued the Jail for several years. Its failure to do so has resulted in injury to multiple detainees, including Plaintiffs. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Plaintiffs constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

## VIOLATION OF THE EIGHTH AND/OR FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

63. Paragraphs 1-62 are incorporated herein by reference.

### A. Individual Liability and Underlying Violation of Constitutional Rights

- **Conditions of Confinement/Failure to Protect**

64. In February 2023, it's believed that Plaintiffs were pretrial detainees.

65. At the time of the complained events, Plaintiffs had a clearly established constitutional right under the adequate conditions of confinement.

66. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the Constitution.

67. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

68. Jail staff had actual knowledge, or it was obvious, that Plaintiffs were at substantial risk of inmate-on-inmate assault, particularly at the hand of Inmate Tasso and his allies at the Jail.

69. With deliberate indifference, Jail staff failed to protect Plaintiffs from harm, and disregarded the known, obvious and excessive risks of harm to Plaintiffs.

70. As a direct proximate result of Jail staff's unlawful conduct, Plaintiffs have suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and damage.

- **Failure to Intervene**

71. Detainees/Inmates like Plaintiffs have a constitutional right to be free from violence at the hands of other inmates.

72. After Tasso and his crew began violently assaulting Plaintiffs, Jail staff knew, or it was obvious, that Plaintiffs were being assaulted and desperately needed assistance.

73. By failing to timely intervene in the assault, as described above, Jail staff were deliberately indifferent Plaintiffs' health and safety.

74. This deliberate indifference resulted was a direct and proximate cause of Plaintiffs' prolonged pain and suffering, a worsening of their condition and mental anguish.

- **Municipal Liability**

75. Paragraphs 1-74 are incorporated herein by reference.

76. The aforementioned acts and omissions of Jail staff are causally connected with customs, practices, and/or policies which the Sheriff/CCSO/County promulgated, created, implemented and/or possessed responsibility for.

77. Those customs, practices, and/or policies are outlined in Paragraphs 44-62, *supra.*

78. The Sheriff/CCSO/County knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Plaintiffs were at substantial risk of harm. Nevertheless, the Sheriff/CCSO/County failed to take reasonable measure to alleviate the risk of harm.

79. The Sheriff/CCSO/County, through their failure to take reasonable remediable measures have been deliberately indifferent to citizens', including Plaintiffs', health and safety.

80. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiffs suffered injuries and damages as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiffs pray this Court grant them the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs

of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiffs***